IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  20-cv-02097

Dale Diamond,

Plaintiff,

v.

W. R. Berkley Corporation, a Delaware corporation, and,

Berkley Insurance Company, a Delaware corporation,

Defendants.
_____

## PLAINTIFF'S COMPLAINT AND JURY DEMAND
_____

**COMES NOW**, Dale Diamond, the named plaintiff ("Diamond"), by and through Sean M. McCurdy of McCurdy and Eichstadt, P.C., attorneys, and hereby complains against Defendants Berkley Insurance Company and W. R. Berkley Corporation (collectively "Berkley"), as follows:

### <u>INTRODUCTION</u>

1.      This action is brought pursuant to the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq.* (the "ADEA").

2.      This is a federal civil rights action for damages and other relief brought by an employee against his former employer.   Diamond was discriminated against, retaliated against, and discharged from employment by Berkley in violation of the ADEA.   As redress for the damages he has suffered, Diamond seeks legal and equitable remedies from Berkley sufficient to make him whole, as more fully set forth below.

## JURISDICTION

3.      This Court's federal question subject matter jurisdiction over Diamond's federal statutory claims is invoked pursuant to the ADEA, 29 U.S.C. § 626(c)(1), and by 28 U.S.C. § 1331 as this action invokes a federal question.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.   Berkley maintains offices and regularly conducts business within the State and District of Colorado.

## PARTIES

5.      During Diamond's employment and continuing thereafter, Berkley has continuously been doing business in the State of Colorado, and has continuously had in excess of 20 employees in Colorado.

6.      During Diamond's employment and continuing thereafter, Berkley has been an interstate company in the insurance industry, and as such was an employer engaged in an "industry affecting commerce", as that phrase "industry affecting commerce" is defined in 29 U.S.C. § 630(h) of the ADEA.

7.      Defendant W. R. Berkley Corporation is an insurance holding company, with Verus Underwriting Managers, LLC ("Verus") as an Operating Unit of its insurance segment. During Diamond's employment, Berkley and Verus were integrated enterprises and Diamond's "employer", as that term "employer" is defined in 29 U.S.C. § 630(b) of the ADEA.

8.      Diamond is a citizen of the United States and a resident of the State of Colorado.

9.      During Diamond's employment, he was an "employee" of Berkley, as that term

"employee" is defined in 29 U.S.C. § 630(f) of the ADEA.

10.     Diamond is 61 years of age, and thus, during his employment at Berkley and continuing thereafter, Diamond is entitled to the rights and privileges protected by the ADEA.

## ADMINISTRATIVE PROCEEDINGS

11.     On or about February 28, 2020, Diamond filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 541-2020-01587 (the "Charge"), which was formally processed by the EEOC on or about March 4, 2020.

12.     This instant action is filed after more than 60 days following the filing of Diamond's Charge and the expiration of the EEOC's exclusive jurisdiction.  A copy of this Complaint will be provided to the EEOC, and the EEOC may continue to investigate Diamond's Charge.

13.     Diamond has exhausted his required administrative remedies and has otherwise complied with all conditions precedent to the filing of this action.

## GENERAL ALLEGATIONS

### Seven Years Under Pilkington

14.     On or about August 8, 2011, Diamond was hired by Dale Pilkington ("Pilkington"), the founder and President of Verus at that time, to re-work the Denver satellite office of Berkley, and to increase the professional liability premium for Berkley.

15.     Diamond moved to Denver, Colorado, from New Jersey, for the job at Berkley, and Diamond began working for Berkley as a Vice President of Underwriting, as Verus' Professional Liability Product Line Leader, in Denver, Colorado.  As such, Diamond was

given complete authority over the Professional Liability Product for Verus.  Diamond worked approximately 55 to 65 hours per work week for Berkley throughout his employment.

16.     During Diamond's employment with Berkley, from August 2011 through December 2019, under Diamond's direction, Verus' Professional Liability product was profitable and grew each year.  Diamond's personal underwriting portfolio, from backing-up his underwriting team, was profitable for Berkley as well.

17.     During Diamond's tenure at Berkley from 2011 through May 2019, Diamond managed thousands of submissions for insurance, profitably and without any substantially detrimental incident, for more than seven years under Pilkington's direct supervision.

18.     Every year during Diamond's employment at Berkley, from 2011 through May 2019, Diamond earned at least acceptable performance evaluations, including a substantial performance bonus and significant restricted stock units, all awarded and approved by Pilkington.

19.     From 2011 through May 2019 at Berkley, Diamond did not have any serious job-related performance issues or behavioral issues resulting in formal discipline by Berkley.

20.     Diamond's overall performance and behavior were at least acceptable during his entire term of employment at Berkley, and he was never formally disciplined in writing for any reason whatsoever at Berkley.

21.     In or around April 2019, Landis Graham (Verus' Senior Vice President of Claims), whom appeared to be in his 60s, resigned his employment at Berkley.

22.     Pilkington (Verus' Founder and President), whom appeared to be in his 60s, announced also in or around April 2019 that he will be leaving Berkley once a new Verus President is hired.

23.     At this time, Pilkington informed the Berkley workforce at Verus that he was leaving Berkley because "corporate was looking for someone with a longer timeframe, to take the company to the next level."

24.     In or around June 2019, Marlo Edwards ("Edwards") was hired as the new President of Verus, to replace Pilkington.  Edwards is significantly younger than Pilkington, appearing to be in her 40s.

25.     In or around June 2019, Edwards became Diamond's immediate supervisor at Berkley.

26.     Within the first couple months as Verus' President, Edwards hired a Vice President of Strategic Initiatives and an Executive Assistant, both of whom appeared to be in their 40s or younger.  Since June 19, 2019 to the present, Edwards hired a total of eight employees, all of whom are in their 40s or younger.

**Replacement Austin**

27.     In July 2019, Jeff Austin ("Austin"), who appeared to be in his late 40s, was the most senior Underwriter under Diamond's supervision, and he had worked at Berkley for approximately eight years.

28.     On July 16, 2019, Austin asked Diamond when they can meet to discuss Austin's career, as he had seen little change or growth in his career at Verus.  The same day, Diamond responded to Austin to the effect that Diamond had previously spoken with Edwards about the lack of growth in career opportunities at Verus, and Diamond offered

to meet with Austin to discuss Austin's career at Verus.

29.     On August 7, 2019, Austin scheduled to meet with Diamond on August 10, 2019, to discuss Austin's career at Verus.  Diamond responded to Austin to the effect that Diamond had worked hard to assist Austin with his career goals at Verus, including requesting Austin's promotion to Vice President / Regional Director, but that recommendation was previously rejected by Pilkington and Doug Grant ("Grant") (Verus' Senior Vice President of Marketing).

30.     The same day, August 7, 2019, Diamond informed Edwards of Austin's request to make progress on his career at Verus, including Diamond's response to Austin, and that Austin might seek employment elsewhere if Austin's career had no possibility of progressing in the near future.  Diamond continued to work with Austin, to see if he could help Austin make progress on his career at Verus.

31.     Soon thereafter, Edwards called Diamond and admonished him for sending a communication to the Professional Liability Team regarding Edwards' growth plan for Verus, and how it would create career opportunities for Team members.

32.     At Verus' yearly planning meeting in September 2019, Edwards was openly hostile toward Diamond, and she ridiculed and dismissed all his ideas and suggestions that he offered to promote growth at Verus, in front of Mr. Diamond's peers.

33.     During the week of October 7, 2019, Edwards and Diamond met alone in-person in Denver, Colorado, to discuss Verus' Professional Liability product.  After this meeting, Edwards cancelled all further one-on-one meetings scheduled with Diamond.

34.     When Diamond visited Verus' headquarters in Richmond, Virginia, later in October 2019, Edwards did not speak with Diamond, not even to say "hello" when

Edwards arrived in the morning.

35.     After several consultations with Austin, on November 1, 2019, Diamond proposed to Shannon Reynolds ("Reynolds") (Verus' Vice President of Strategic Initiatives) that a new position of Regional Director could be created at Verus for Austin, which would be a promotion for Austin, and Diamond included an outline of a job description, objectives, key internal tasks, planned outcomes, a means to measure success, key stakeholders, and prioritization for the proposed new Regional Director position.

36.     On November 11, 2019, Reynolds responded to Diamond and recommended that he share the proposal for a new Regional Director position for Austin with Donna Highfill ("Highfill") in Human Resources ("HR") at Berkley, and with Edwards and Grant.

37.     On November 22, 2019, per Reynolds' recommendation, Diamond forwarded to Highfill, Edwards, and Grant, the proposal for a new Regional Director position for Austin, on which Austin and Diamond had collaborated, for their review and consideration.  Neither Highfill nor Edwards ever responded to Diamond.

**Six Months Under Edwards**

38.     From June 2019 when Edwards was hired as President of Verus, until August 7, 2019 when Diamond informed Edwards of Austin's request to be promoted at Verus, Diamond had a good working relationship and several positive meetings with Edwards.

39.     From August 7, 2019 when Diamond informed Edwards of Austin's request to be promoted at Verus, and continuing to the termination of Diamond's employment at Berkley, Edwards appeared to be biased against Diamond, without any good reason, even before she had a reasonable opportunity to evaluate Diamond based upon his

work at Berkley.

40.     From August 7, 2019 when Diamond informed Edwards of Austin's request to be promoted at Verus, and continuing through the termination of Diamond's employment at Berkley, every interaction that Diamond had with Edwards was negative from her.

41.     After August 7, 2019 when Diamond informed Edwards of Austin's request to be promoted at Verus, Edwards repeatedly issued assignments to Diamond that were vague and unusual, including numerous tasks that were impossible to complete under the circumstances, and she repeatedly bombarded Diamond with negative criticism and unjustified blame.

42.     After August 7, 2019 when Diamond informed Edwards of Austin's request to be promoted at Verus, and continuing through the remainder of the year, Edwards repeatedly failed to properly review the work Diamond completed and sent to her, including policy forms, endorsements, and application revisions.

43.     From approximately August 2019 to January 2020, due to Diamond's age, Edwards appeared to be planning and engaging in efforts to replace Diamond with Austin, as the Vice President of Underwriting at Berkley and Professional Liability Product Line Leader at Verus.

### Age Complaint to HR

44.     Due to other long-tenured employees in their 60s suddenly no longer being employed with Berkley at Verus, Pilkington being replaced by a substantially younger employee, Pilkington stating that his separation was due to Berkley wanting someone with a "long-term timeframe", Edwards hiring relatively young workers promptly after becoming President of Verus, Edwards arranging for a 10-year younger employee to

assume Diamond's position, Edwards not approving the promotion and new position for Austin without any explanation, Edwards imposing nearly unachievable tasks on Diamond, Edwards' nearly constant blame and criticism of Diamond's work for no good reason, and Edwards consistent display of disdain for Diamond for no good reason, among other concerns, led Diamond to reasonably believe that Edwards was seeking to terminate him based upon his age.

45.    On November 12, 2019, Diamond emailed Highfill in HR at Berkley, stating that he needs to speak with her as soon as possible.  They arranged to speak by phone the next day.

46.    On November 13, 2019, Diamond made a formal complaint of age discrimination to Highfill via telephone, wherein Diamond specifically complained to Berkley that Edwards appeared to be positioning him for termination due to his age.

47.    During this conversation, Diamond informed Highfill that Edwards had made it obvious that he is not part of Edwards' plan for Verus going forward, and it is improper and unlawful for Edwards to falsely manufacture performance issues to terminate him due to his age.

48.    Highfill responded to Diamond that she would discuss the matter with Edwards, and then she would talk to Diamond again.

49.    A few days later, Highfill called and informed Diamond that she had discussed his age discrimination complaint with Edwards, Edwards had denied that she had any plans to terminate Diamond, and that in the future Diamond needed to discuss his concerns with Edwards directly.

50.    Other than Highfill informing Edwards about Diamond's age complaint, Highfill

and Berkley conducted no investigation into Diamond's age discrimination complaint prior to Diamond's termination at Berkley.

51.     Defendants did not take any prompt or effective remedial action to stop age discrimination by Edwards against Diamond at Berkley.

**Retaliation**

52.     Approximately nine days after complaining about age discrimination to HR at Berkley, on November 22, 2019, as directed by Highfill, Diamond had a web-based video-conference with Edwards (the "web-conference").

53.     In the web-conference, Edwards appeared angry with Diamond from the beginning, pointing-out to Diamond at the beginning of the web-conference that he "went to HR."

54.     In the web-conference, Edwards accused Diamond of poor work performance, stating that the Professional Liability product line Diamond managed was not profitable, and that Diamond's team was not successful.

55.     Edwards' accusations against Diamond of poor work performance during the web-conference were objectively false.

56.     In the web-conference, Edwards repeatedly interrupted Diamond and refused to allow Diamond to speak when he repeatedly attempted to explain to her that his work performance was good, the product line he managed was profitable, and his team was successful.

57.     Diamond reasonably believed that in the web-conference he was being retaliated against by Edwards for complaining about age discrimination to HR, and following the web-conference Diamond expected to be terminated by Edwards for complaining about

age discrimination.

58.     Approximately 12 days after complaining to HR about age discrimination, on November 25, 2019, Diamond received two unusual and hostile emails for handling routine job assignments at Berkley.

59.     On November 25, 2019, Grant (Verus' Senior Vice President of Marketing) emailed Diamond, and copied Edwards.  In this email, Grant criticized Diamond's recommendation of a wholesale Broker for an appointment.

60.     For approximately the previous eight years, this had been a routine part of Diamond's job at Berkley, and it had never before caused a problem or raised a concern.

61.     On November 25, 2019, Edwards emailed Diamond and threatened to terminate his employment at Berkley, related to Diamond's handling of a referral from Leslie Franz, Verus' Assistant Vice President and Garage Product Line Leader.

62.     For approximately the previous eight years, this had been a routine part of Diamond's job at Berkley, and it had never before caused a problem or raised a concern.

63.     Due to the pretextual nature of these two emails, Diamond reasonably believed they were in retaliation for his complaint of age discrimination to HR, and they were designed to try to create a basis for Diamond's termination for cause.

64.     The same day, November 25, 2019, Edwards sent an email to Diamond and copied Highfill in HR, requesting that Diamond travel to Richmond, Virginia, the week of December 3rd for an in-person meeting with Edwards and Highfill to discuss Diamond's role and performance at Berkley.  At this planned meeting, Berkley intended to

terminate Diamond's employment.

65.     Diamond responded to Edwards to the effect that he had an oral surgeon's appointment in Denver that week, but he had a trip to Richmond, Virginia, planned after the holidays, during the week of January 6, 2020, but he could come to Richmond sooner if necessary.

**The Law Firm Policy**

66.     In late-October 2019, while Diamond was backing-up Berkley Underwriter Kalee Nichols, who was under Diamond's supervision, Diamond declined a submission for insurance from the DJR Law Firm (the "Law Firm").

67.     A Wholesale Broker from Program Brokerage Corporation ("PBC"), representing Berkley as its agent, who was working with a retail insurance agent representing the Law Firm, then sent Diamond additional information, and requested another review with a quote to include prior acts, and a quote with a retro inception date.  Diamond sent the PBC Broker both quotes.

68.     Diamond heard nothing further from the PBC Broker until approximately the middle of November 2019, when the PBC Broker emailed Diamond with an instruction for him to '[p]lease bind with prior acts effective 11.21.19".

69.     Based upon the instruction from the PBC Broker, and because the previous policy had expired, Diamond reasonably understood that the PBC Broker wanted the policy bound pursuant to the previous quote, with a retro-inception date of November 21, 2019.  Diamond instructed Berkley Underwriting Assistant Ben Ellis ("Ellis") to bind the policy accordingly.

70.     On November 22, 2019, one day after the policy incepted, the insured Law Firm

filed a claim with Berkley, including a copy of a malpractice lawsuit that had been filed against the Law Firm.  Berkley Claim Handler Regina Nix declined the claim based upon the retro-inception date.

71.     On December 3, 2019, the PBC Broker called Diamond and informed him that the Law Firm policy was issued incorrectly by Berkley, as it should not have been issued with a retro-inception date.  The PBC Broker informed Diamond that he had intended his previous email to instruct Diamond to "[p]lease bind with prior acts**,** effective 11.21.19", and he had neglected to include the comma.

72.     The confusion with the initial binding of the Law Firm policy was a combination of Diamond and Ellis misreading what the PBC Broker intended, and the PBC Broker failing to include a comma to make his request clear to Diamond.

73.     The error in the issuance of the Law Firm policy was not the fault of the retail agent or the Law Firm, but rather, it was entirely the fault of Berkley's agents or employees.

74.     Diamond properly instructed Ellis to correct the Law Firm policy to include the requested prior acts date.

75.     The Law Firm claim was then resubmitted to Claims Handler Regina Nix, who again denied it.  This second denial of coverage was due to the Law Firm having prior knowledge of the lawsuit and not disclosing it on Berkley's Insurance Application, as required.

76.     During the week of December 5, 2019, Edwards and Tammy Garland (Berkley Vice President of Claims) called Diamond about this Law Firm claim, and Edwards verbally berated Diamond, including falsely stating, "this is going to cost the company a

million dollars."

77.     On or about December 5, 2019, Diamond went to Urgent Care for stress-related rash or hives, due to age harassment and retaliation against him from Edwards at Berkley.

78.     On December 8, 2019, Diamond emailed Edwards and Ms. Garland regarding the claim by the Law Firm, wherein he apologized for accommodating the PBC Broker and not sticking with his original declination, and for not noticing the missing comma leading to a misinterpretation of the PBC Broker's instructions for binding the policy.

79.     In this email, Diamond also wrote that this was his first error in 8.5 years, that he was quick to correct the error after being notified of the mistake, and he was confused over their previous discussion, wherein they stated he should not have corrected the Law Firm policy because of the claim and the fact that CNA planned to pick-up the claim.

80.     The same day, December 8, 2019, Diamond emailed Highfill regarding the issues with the Law Firm policy, informing HR to the effect that the problem was caused by the stress and anxiety from the unreasonable expectations and constant criticism he was enduring from Edwards.

81.     In this email, Diamond also stated words to the effect that the age discrimination and retaliation against him by Edwards had affected his performance and was having a physical effect on him.

**Termination**

82.     On January 3, 2020, Diamond's employment at Verus was summarily terminated by Edwards, via telephone.  Also on this call were Robert Stone (Berkley Executive Vice

President of Excess and Surplus Lines Segment), Carol LaPunzinga (Berkley Senior Vice President of HR), and in Denver, Brandon Heutmaker (Berkley Senior Vice President & Chief Actuary Officer).

83.     During this call, Edwards informed Diamond that he was immediately terminated due to the Law Firm matter, and no other reason was given by anyone.

84.     On or about January 3, 2020, Verus' Professional Liability team at Berkley, formerly managed by Diamond, was directed by Berkley to send any referrals and any questions to Austin.

85.     After Diamond's termination at Berkley, Austin assumed some or all of Diamond's former role or responsibilities at Berkley, and Austin formally assumed Mr. Diamond's former position at Berkley on or around July 1, 2020.  The open position was never posted internally or externally, and excluding Mr. Austin no formal interviews were conducted.

86.     After the termination of Diamond's employment at Berkley, Diamond was replaced at Berkley by a significantly younger worker.

87.     At the time of the termination of Diamond's employment at Berkley, Diamond was the eldest of the Verus Underwriters in the State of Colorado.

**Pretext**

88.     Berkley's reason for Diamond's termination is pretextual, in part because of the short ***temporal proximity*** between Diamond's protected complaint to HR and his subsequent termination, which tends to show an unlawful motive by Berkley.

89.     Diamond's termination was less than two months after his protected age complaint to HR.  More specifically, Diamond's employment was terminated at Berkley

approximately 51 days after his age complaint at Berkley.

90.     Berkley's reason for Diamond's termination is pretextual, false, or contrived, as any error was largely, if not entirely, the **fault of the PBC Broker.**

91.     Diamond correcting the Law Firm policy was within Diamond's authority at Berkley, it was legally and ethically required after Diamond became aware that the policy was issued incorrectly, and it was in the overall best interests of Berkley. Refusing to correct the policy would have been fraudulent and in bad faith.

92.     Berkley's reason for Diamond's termination, after approximately eight very successful years at Berkley, is pretextual, unique, and unworthy of belief, contrary to all of Diamond's prior treatment, and **contrary to Berkley's prior practice.**

93.     The decision to terminate Diamond was against the overall financial interests of Berkley, and therefore, it was absurd to terminate Diamond's employment based upon this single Law Firm issue.

94.     In 2019, Diamond increased written premiums for Berkley at Verus by approximately $3 million over plan, Diamond achieved targets on renewal rate increases, and he had a declining loss ratio.

95.     During his employment at Berkley, Diamond successfully and profitably handled thousands of submissions for insurance coverage at Berkley.

96.     Throughout his employment at Berkley, Diamond approved policies which on occasion were not profitable for Berkley, as did every other Berkley employee in a similar position with Diamond's length of service.  When writing insurance, risks are inherent, and over many years some policies will inevitably result in claims and controversies.

97.     Any negative financial impact on Berkley related to Diamond's actions on the Law Firm matter was relatively minor, especially compared to the profits Diamond achieved for Berkley in 2019, and all previous years of his employment at Berkley.

98.     Berkley's reason for Diamond's termination was far out of proportion to the harm caused to Berkley from any error by Diamond.

99.     Never before had anyone at Berkley in similar circumstances as Diamond suffered summary termination based on a similar issue as Diamond.

100.    Berkley's reason for Diamond's termination is pretextual because Berkley engaged in disturbing procedural irregularities related to Diamond's termination, as Berkley failed to follow its own *progressive disciplinary policy.*

101.    During Diamond's entire term of employment at Berkley, he was never formally disciplined in writing for any reason whatsoever, prior to his termination of employment.

102.    Related to the Law Firm matter, Diamond was never formally disciplined in writing, and he was never placed on any type of Performance Improvement Plan ("PIP").

103.    Diamond had acceptable or excellent overall work performance year after year at Berkley, including in 2019.

104.    Diamond's work performance, as reflected on his last formal Performance Evaluation at Berkley, ranked him as "meets expectations" overall.

105.    At Berkley, termination was not the customary remedy following any single error in underwriting judgment resulting in a relatively minor claim.

106.    At Berkley, termination without any prior formal written warning, and without any opportunity for correction, was customarily reserved for intentional malfeasance, theft,

or harassing or violent workplace conduct.

107.    At Berkley, unless there was intentional malfeasance, a written warning or a PIP were the customary courses of discipline, providing an opportunity for correction, prior to termination of employment.

108.    The Law Firm matter did not rise to the level to necessitate the termination of Diamond's employment at Berkley.

109.    Pilkington repeatedly reinforced to Diamond, explicitly expressed to Diamond, and followed a customary practice with Diamond and others that writing a single policy, even resulting in a large claim, would not result in termination, without first following a course of progressive discipline and providing an opportunity for correction.

110.    Berkley acted contrary to an unwritten policy or contrary to customary practice when it summarily terminated Diamond.

111.    Berkley's reason for Diamond's termination is pretextual because Berkley engaged in disturbing ***procedural irregularities in its investigation*** (or a lack of any investigation at all) of Diamond's age discrimination complaint at Berkley.

112.    Diamond complained to HR at Berkley that due to his age, his new supervisor, Edwards, appeared to be looking to place a significantly younger employee in his position, and Edwards was targeting him and looking for reasons to terminate him for cause due to his age.

113.    When Diamond complained to Berkley HR on November 13, 2019, about age discrimination, HR did not conduct a reasonable investigation, and did not take any prompt and effective remedial action to stop the discrimination, contrary to Berkley policy.

114.    Rather than follow its customary complaint investigation process, Berkley HR notified the perpetrator, Edwards, of Diamond's discrimination complaint against her, and told Diamond to speak with Edwards about it.

115.    In their next conversation during the web-conference, Edwards verbally chastised Diamond directly for complaining to HR, she was livid with Diamond, and she flagrantly displayed her retaliatory animus toward Diamond.

116.    Approximately 12 days after Edwards learned of Diamond's age discrimination complaint against her at Berkley, on approximately November 25, 2019, Edwards threatened Diamond with termination, in writing, for something that occurred often with Diamond's co-workers and did not result in discipline or termination for his co-workers.

117.    Edwards fulfilled her threat and terminated Diamond's employment at Berkley approximately five weeks later, on January 3, 2020, without any notice or opportunity for correction by Diamond.

118.    Berkley's reason for Diamond's termination is pretextual because co-worker **comparators** of Diamond at Berkley engaged in far more egregious performance errors than him, but they were treated much better than Diamond by Berkley.

119.    During Diamond's employment at Berkley, other Underwriters approved policies or took other actions which resulted in much more serious claims and losses to Berkley, and these other Underwriters were not summarily terminated like Diamond, and they were not even formally disciplined.

120.    For example, a Berkley worker who was a Casualty Underwriter at Verus, Josh Gotter, who appeared to be approximately 35 years old, wrote several liquor liability policies outside the underwriting guidelines, and failed to take appropriate action

following negative inspections.

121.    Mr. Gotter's actions resulted in several large claims, including death claims, with several millions of dollars paid out by Berkley.

122.    Although Mr. Gotter received verbal and written warnings, and he was placed on a 30-day PIP by Berkley, Mr. Gotter was not terminated related to this matter, and he was later allowed to voluntarily resign.

123.    As another example, a Berkley employee who was a Property Underwriter at Verus, Larry Landon, who appeared to be approximately 50 years old, performed a favor for a Broker on a Friday afternoon by providing replacement coverage for a complex with several buildings, without receiving proper verification.  One of the buildings burned promptly after the policy was in place, resulting in a high six-figure loss to Berkley.

124.    This Underwriter, Mr. Landon, was neither reprimanded, nor formally disciplined in writing by Berkley related to this matter.

125.    As another example, there was a claim upon Berkley called Griffin-Campbell, involving a 2013 Philadelphia building collapse.  Steve Gillespie, an Assistant Vice President / Casualty Underwriter for Berkley at Verus, who appeared to be approximately 45 years old, wrote the policy for the demolition contractor involved.

126.    There were questions about whether proper research and data collection were performed on the applicant by Mr. Gillespie, to determine if the applicant was providing multi-story demolition services in downtown Philadelphia.  It was questioned whether this risk fell within the Underwriting guidelines of Berkley.  Additionally, there was a non-payment of premium, so the policy should have been cancelled, but was not.

127.    More than $1.4 million was spent by Berkley on the claim.  Mr. Gillespie was not reprimanded or disciplined by Berkley, and he was not terminated related to the Griffin-Campbell matter.

128.    The employment of these and other significantly younger Underwriters at Berkley, both in and outside of Colorado, was not terminated by Berkley, for the same or similar conduct or performance as Diamond, or for much worse conduct or performance.

129.    Diamond has never received any explanation as to why he was treated so vastly different from his co-workers, and why he was terminated without any opportunity for correction, while his co-workers were not terminated, and in some cases, not even reprimanded or disciplined in writing, for much more serious performance issues at Berkley.

130.    It has never been the policy or practice of Berkley at Verus to reprimand, discipline, or terminate an Underwriter for using underwriting judgment within their authority, or even for going outside of their authority on at least one occasion, other than with Diamond.

### Damages

131.    Berkley's conduct as described herein has caused Diamond economic damages, both in the past and the future.

132.    At the end of Diamond's employment at Berkley, he was earning a base salary of $200,000 annually, plus a performance bonus averaging approximately $16,000 annually, plus stock amounting to approximately $60,000 annually, plus insurance-related benefits amounting to approximately $26,685 annually, resulting in a total

compensation package of approximately $302,685 gross per year.

133.    Berkley has engaged in other similar acts of age discrimination against employees.  Since at least June 2018, Berkley has engaged in discrimination against employees on the basis of age with regard to the terms and conditions of their employment, tending to show an unlawful state of mind through these other similar acts.

134.    Berkley purposefully intended to unlawfully discriminate and retaliate against Diamond in his employment, based upon his age, and directly intended to cause Diamond's unlawful discharge from employment.

135.    As a direct and proximate result of Berkley's unlawful employment practices complained of herein, Diamond has suffered, and in the future will continue to suffer, back pay and fringe benefit losses, front pay and benefit losses, out-of-pocket pecuniary losses, lost future earnings capacity, and other compensable economic losses to be proven at trial.

136.    Diamond is entitled to liquidated damages, and attorneys' fees and other costs, in addition to other damages.

## FIRST CLAIM FOR RELIEF

### [Age Discrimination under the ADEA – Terms & Conditions - Termination]

137.    Diamond incorporates herein paragraphs 1-136 above, as if fully set forth herein.

138.    At all times Diamond has been qualified for the Professional Liability Product Line Leader (Vice President, Underwriting) position he held at Berkley.

139.    Berkley committed unlawful employment practices against Diamond according to 29 U.S.C. § 623(a) of the ADEA by terminating and otherwise discriminating against Diamond with respect to his terms, conditions, and privileges of employment with Berkley,

on the basis of his age, despite his qualifications and ability to perform the fundamental job functions of the Professional Liability Product Line Leader (Vice President, Underwriting) position at Berkley.

140.   As Berkley and its duly authorized agents knew that their actions towards Diamond constituted willful and intentional violations of the ADEA or showed reckless disregard for the fact that their conduct was prohibited by the ADEA, Berkley did not make good faith efforts to comply with the ADEA.

141.   Because of the unlawful employment practices of Berkley, Diamond has suffered damages to be proven at trial; he is entitled to actual damages and double actual damages as liquidated damages pursuant to 29 U.S.C. § 626(b), in addition to other damages and equitable relief, to be proven at trial.

## SECOND CLAIM FOR RELIEF

### [Retaliation under the ADEA]

142.   Diamond incorporates herein paragraphs 1-141 above, as if fully set forth herein.

143.   Berkley committed an unlawful employment practice prohibited by 29 U.S.C. § 623(d) of the ADEA by retaliating against Diamond, by discharging him based upon his complaints of unlawful discrimination and his opposition to unlawful employment practices.

144.   This violation was intentional, willful and wanton, or was done with malice or with reckless indifference to Diamond's federally-protected rights, and Diamond is entitled to liquidated damages, in addition to other damages and relief, to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff, Dale Diamond, respectfully prays for judgment in his favor

and against the Defendants Berkley, and that the Court order the following relief against the Defendants Berkley:

A.  Award past economic damages, and future economic damages in lieu of reinstatement, for all claims as allowed by law, in an amount to be determined at trial, including, but not limited to, back pay and lost benefits, front pay and benefits including stock, other pecuniary economic damages, and damages for lost future earnings capacity;

B.  Pre-judgment and post-judgment interest;

C.  Attorneys' fees and costs, including expert witness fees, as allowed by law;

D.  Liquidated damages, as provided by law;

E.  Equitable relief, including, without limitation: (a) ordering Berkley to apologize to Diamond publicly, orally and in writing, for its unlawful employment practices committed against him; and, (b) ordering the posting of this Court's Judgment and Order in this action in a conspicuous location at all of Berkley's facilities located within the District of Colorado; and,

F.  Any other appropriate relief necessary to make Diamond whole and compensate him for the civil rights violations described above, and any further legal and/or equitable relief, including training and education for Berkley's employees, managers, and executives, as deemed appropriate by the Court and authorized by law.

## **JURY TRIAL DEMAND**

Pursuant to Fed.R.Civ.P. 38, Diamond demands a jury trial on all issues of fact raised by his Complaint.

## **ATTORNEY CERTIFICATION**

I hereby certify that I am a member in good standing of the bar of this court, and I appear in this case as counsel for Plaintiff Diamond.

RESPECTFULLY SUBMITTED on this the 17th day of July 2020.

_**s/ Sean M. McCurdy**_
Sean M. McCurdy
McCURDY & EICHSTADT, P.C.
9085 E. Mineral Circle, Suite 380
Centennial, Colorado 80112-3462
Telephone:  (303) 832-8870
Fax:  (303) 832-8871
E-mail:  mccurdy@mccurdy-eichstadt.com
_Attorney for Plaintiff Dale Diamond_